# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 10-21647-TLM** |
| **ROBERT J. HOBART and** | ) | |
| **SHERRI L. HOBART,** | ) | |
| | ) | **Chapter 13** |
| Debtors. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

Before the Court is the question of confirmation of the amended chapter 13
plan of joint debtors Robert and Sherri Hobart ("Debtors"), Doc. No. 36 ("Plan").[1]
An objection to confirmation was raised by creditor Oregon Community Credit
Union ("OCCU").  Doc. No. 43 ("Objection").  An evidentiary hearing on
confirmation was scheduled for May 2, 2011.

On April 24, Debtors filed an objection to proofs of claim filed by OCCU.
Doc. No. 51 ("Claim Objection").  Though the Claim Objection could not
properly be noticed for hearing on May 2, *see* Fed. R. Bankr. P. 3007(a) (requiring
30 days notice of hearing on objections to claims), OCCU agreed that it could be
tried and submitted at the May 2 hearing.

_____

[1]  Unless otherwise indicated, all statutory references, including those to chapter and
section, are to the Bankruptcy Code, Title 11, U.S. Code §§ 101-1532, and all rule references are
to the Federal Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 1

The parties presented evidence on both confirmation and the Claim

Objection. *See* Doc. No. 58 (minute entry).[2]  At the conclusion of the hearing,

confirmation of the Plan and the Claim Objection, and all subsidiary issues, were

taken under advisement.  In large part, the dispute presented turns on a single

point – whether a cross-collateralization clause in OCCU's lending documents is

enforceable under applicable state law.  As discussed below, this is not a clear cut

question.  Moreover, tangential legal issues and a muddy evidentiary record

complicate the analysis.

This Decision constitutes the Court's findings of fact and conclusions of

law under Rules 9014 and 7052.

**FACTS**[3]

Debtors filed a voluntary chapter 13 petition, schedules and statements on

December 14, 2010.  Doc. No. 1.[4]  Debtor Robert Hobart has been employed by

Fred Meyer for 19 years and is currently a "director" with that retail store.  Sherri

---

[2]  Eric Ciferri, Jeffrey Gerdes, and debtor Robert Hobart testified.  Creditor's Exhibit Nos. 202-209 and Debtors' Exhibit Nos. 113 and 114 were admitted.  *See* Doc. No. 58.  Certain aspects of the evidentiary presentation are discussed *infra*.

[3]  For narrative flow and clarity, certain facts are addressed in the "Discussion and Disposition" portion of this Decision.

[4]  The Court takes judicial notice of its files and records to fill gaps in the evidence presented at hearing.  Fed. R. Evid. 201.  Assertions of Debtors in their sworn schedules and statements are capable of treatment as evidentiary admissions under Fed. R. Evid. 801(d)(2).  *See*, *e.g.*, *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 444 n.32 (Bankr. D. Idaho 2008); *Murrietta v. Fehrs (In re Fehrs)*, 391 B.R. 53, 62 n.16 (Bankr. D. Idaho 2008).

MEMORANDUM OF DECISION - 2

Hobart is self-employed as a day care provider. *Id.* at Schedule I.

Debtors' physical assets include 14 separate vehicles and a boat. *Id.* at Schedule B. Among these vehicles are a 1999 Ford Expedition (the "Expedition"), a 1999 Ford F-250 pickup truck (the "F-250"), and a 2000 Coachman Leprechaun RV (the "RV"). Debtors asserted that the values of these three vehicles were $1,000.00, $6,520.00, and $17,696.00, respectively. *Id.* Debtors admit that OCCU has a security interest in each of the vehicles. *Id.* at Schedule D. Debtors scheduled OCCU's claim against the Expedition at $1,297.00, of which $297.00 is unsecured based on Debtors' asserted value; OCCU's claim against the F-250 at $3,220.00 which would result in $3,300.00 of equity given the $6,520.00 alleged value;[5] and OCCU's claim regarding the RV at $25,392.00 of which $7,696.00 is unsecured. *Id.*

OCCU filed three proofs of claim in this case, Claim Nos. 4-6. Claim No. 4 asserts a $24,945.48 claim on Loan No. 5865 (made in connection with the RV), Claim No. 5 asserts a claim of $776.61 on Loan No. 2161 (the Expedition), and Claim No. 6 asserts a claim of $3,003.14 on Loan No. 8290 (the F-250).[6] Each of these proofs of claim, however, alleges that its subject loan and claim is secured

---

[5] Debtors claim a $3,300.00 exemption in the F-250 under Idaho Code § 11-605(3). *Id.* at Schedule C.

[6] Copies of these three proofs of claim were introduced as Exhibit Nos. 201, 202 and 203.

MEMORANDUM OF DECISION - 3

by the Expedition, F-250 *and* the RV, allegedly worth collectively $22,650.00.[7]

Debtors' Plan proposes to pay OCCU the amount of $776.61 on the Expedition, in monthly installments with interest at 6.650% per annum, and $3,003.14 on the F-250 in monthly installments at the same rate of interest. The § 362(a) stay has been lifted by agreement on the RV, and that asset has been surrendered to OCCU for liquidation. As of hearing, OCCU's counsel could not advise where OCCU was in the liquidation process.

## DISCUSSION AND DISPOSITION

The Court first disposes of Debtors' argument, though not vigorously made, that because there were some other uses made of the cash advanced in connection with the RV loan (about $3,700.00 out of $26,509.00), the use of the bulk of the advance to acquire the RV lost its purchase money nature. Because the RV been surrendered to OCCU, the Court need not reach the purchase money issue raised by Debtors. A creditor who has received its collateral under § 1325(a)(5)(C) in partial satisfaction of its claim, as OCCU has done here, may assert a deficiency claim for the difference between the collateral's net value after disposition and the creditor's total claim, regardless of whether that creditor holds a so-called "910-

---

[7] Because the "collateral" is collectively shown as having a value of $22,650.00, each of the three proofs of claim also asserts an unsecured claim of $6,075.23. This is true even for the claims on the Expedition and the F-250 where the total amount of the asserted claim itself is less than $6,075.23. *See* Ex. Nos. 202 (Claim No. 5) and 203 (Claim No. 6). Amended claims were later filed by OCCU eliminating any assertion of unsecured claims on the three loans. Ex. Nos. 204-206.

MEMORANDUM OF DECISION - 4

day claim" – shorthand for a type of purchase money security interest in certain

personal property obtained by a debtor within 910 days of filing the petition.

*Wells Fargo Fin. Acceptance v. Rodriguez (In re Rodriguez)*, 375 B.R. 535, 540-

41 (9th Cir. BAP 2007).[8] Thus, any deficiency claim on the RV loan, *i.e.*, the

balance of the $24,945.48 claim after application of the net value of the RV

received upon liquidation, must be treated under the Plan.

      The more hotly contested issue dividing the parties here is whether the

deficiency on the RV loan must be treated as secured or unsecured under Debtors'

Plan.  Debtors contend that any deficiency is nothing more than a general

unsecured claim, and that any cross-collateralization attempts are ineffective under

applicable state law.  OCCU argues that it has a "secured deficiency" claim

because, by virtue of proper cross-collateralization, whatever value exists in the

Expedition (over the $776.71 debt) and in the F-250 (over the $3,003.14 debt)

---

     [8]  The requirements for a 910 claim under the "hanging paragraph" of § 1325(a), *i.e.*, the separate, unnumbered paragraph following § 1325(a)(9), are (1) the creditor must have a purchase money security interest or "PMSI"; (2) that PMSI must secure the debt that is the subject of the claim; (3) the debt must be incurred no more than 910 days before the date of the debtor's bankruptcy filing; (4) the collateral for the debt must be a motor vehicle; and (5) the motor vehicle must have been acquired for the personal use of the debtor.  *Americredit Fin. Servs., Inc. v. Penrod (In re Penrod)*, 392 B.R. 835, 841 (9th Cir. BAP 2008), *aff'd*, 611 F.3d 1158 (9th Cir. 2010) (citing *Trejos v. VW Credit, Inc. (In re Trejos)*, 374 B.R. 210, 215 (9th Cir. BAP 2007)).  The "hanging paragraph" makes § 506, which provides for the bifurcation of secured claims into secured and unsecured portions, inapplicable to 910 claims.  *Rodriguez*, 375 B.R. at 540-41 & n.5.  *Rodriguez* resolved, in this Circuit, that surrender of collateral under § 1325(a)(5)(C) to a creditor with a claim subject to the hanging paragraph did not eliminate that creditor's right to assert a claim for a deficiency.  *Id.* at 548-49.

MEMORANDUM OF DECISION - 5

goes to secure the amount of the RV obligation not satisfied by liquidation of that vehicle.  Since the deficiency is secured up to the remaining value in the Expedition and F-250, argues OCCU, that secured deficiency claim must be paid through Debtors' Plan under § 1325(a)(5)(B).[9]

The debate is thus framed as follows.  Debtors, by their schedules, suggest a $7,696.00 deficiency to OCCU on the RV.  Their schedules show no equity in the Expedition and $3,300.00 of equity in the F-250.  If they lost the cross-collateralization debate, and if their numbers were to hold, they would have to provide for payment of the $3,300.00 to OCCU as a secured creditor.  OCCU's written and oral argument presumes a maximum value of the RV of $13,632.00, leaving a $11,313.48 deficiency.  OCCU posits that the Expedition is worth $5,652.00 (equity of $4,875.79 after deduction of $776.61 secured claim) and the F-250 is worth $7,505.00 (equity of $4,501.86 after deduction of $3,003.14 secured claim).  It contends, therefore, that a minimum of $9,377.65 must be paid as additional secured debt.[10]

Debtors' Claim Objection not only reasserts their valuations of the three

---

[9]  Section 1325(a)(5)(B) requires that a debtor's plan provide a non-accepting creditor, whose collateral is to be retained, payments equal in value to the allowed amount of the creditor's secured claim.  *See Shook v. CBIC (In re Shook)*, 278 B.R. 815, 822 (9th Cir. BAP 2002).

[10]  OCCU argued that the RV will likely be liquidated for less than the $13,632.00, thus increasing the RV deficiency.  However, given the values it suggests for the two Ford vehicles, it admitted the increased deficiency would be unsecured.  *See* Doc. No. 43 (OCCU Objection) at 3-4.

MEMORANDUM OF DECISION - 6

vehicles, but also attacks the proposition that OCCU's deficiency claim related to the RV (in whatever amount) is properly cross-collateralized by the Expedition and/or F-250.

### A.    Valuation of the collateral

As noted, the Plan proposes to pay OCCU $776.71 (plus interest) for the Expedition, and $3,003.14 (plus interest) for the F-250. Doc. No. 36 at 5. The Plan includes an incorporated "motion" seeking to establish those values. *Id.* at 4-5 (§ 4.2 of the Plan, providing that Debtors "move" for an order fixing the amount of the secured claims at the amounts proposed). OCCU's Objection did not contest the interest rate proposed. But it did dispute the valuation of the two Fords. *See* Doc. No. 43 at 1 (asserting Expedition replacement value at $5,652.50 and F-250 replacement value of $7,505.00). The disagreement over valuation arises in connection with OCCU's argument that the "excess" value in the two vehicles should also secure the "deficiency" on the surrendered RV.[11]

The valuation evidence presented was fraught with problems. OCCU's witness, Mr. Ciferri, had the experience necessary to qualify as an expert witness.

---

[11] In the ordinary case, it would be unusual for the Court to hear valuation evidence regarding the two Fords, since both parties agreed the values of those vehicles were in excess of the direct loan debts secured thereby, and the claims (of $776.71 and $3,003.14) would simply be funded in full. The only "valuation" issue that would ordinarily arise in such a situation would be the amount of non-exempt equity in either item of collateral that would impact the § 1325(a)(4) standard for confirmation. But the attempt of OCCU here to establish that the deficiency claim on the RV is secured by the "excess" value in the two Fords led to the presentation of evidence on value.

MEMORANDUM OF DECISION - 7

*See In re Smitty Inv. Group, LLC*, 2008 WL 2095523, at *7-11 (Bankr. D. Idaho
May 16, 2008) (discussing Fed. R. Evid. 702 and 703, and noting witness can be
qualified as an expert by reason of experience).  However, he did not inspect or
physically evaluate either the Expedition or the F-250.[12]  He conducted only an
online N.A.D.A. valuation for OCCU.  While recourse to such data sources and
materials may be a regular practice in valuing used vehicles, Mr. Ciferri did not
confirm that the correct equipment or accurate specifications for the vehicles were
used in that analysis.  Further, he used an "eastern [U.S.] region" valuation rather
than one for the area in which Debtors lived and the vehicles were located.  His
testimonial estimates of value drawn from the N.A.D.A. inquiry ($3,500.00 for the
Expedition and $5,500.00 to $6,500.00 for the F-250) were not well supported.
The Court concludes that his valuation testimony did not meet the requirements of
the second aspect of the rules addressed in *Smitty Group* – *i.e.*, even if experience
qualifies one as an expert, that witness must show that the expertise and
experience was appropriately applied, in a reliable and methodologically sound
manner, to the issue on which the testimony is directed.  His valuation testimony,
and the N.A.D.A. documents he prepared and used, are entitled to little if any
weight.

------

[12]  He testified that he was retained to inspect and value the RV, and "saw" the two other
vehicles, noting that the Expedition seemed to "run well" as it was driven by Debtors onto the lot
where he was looking at the RV.

MEMORANDUM OF DECISION - 8

Debtors faired slightly better.  Their witness, Mr. Gerdes, was similarly qualified as an expert based on significant work experience for car dealerships and car liquidators.  And he actually inspected and drove the two Fords at issue, a significant improvement over OCCU's witness.  His critique of the N.A.D.A. approach used by OCCU was persuasively made.  On the other hand, a legitimate question was presented by the fact that Mr. Gerdes is the brother-in-law of Mrs. Hobart.

Mr. Gerdes valued the 1999 Expedition at $1,500.00 to $2,000.00 in its present condition and with its features and equipment.  He placed the value of the 1999 F-250 at $4,500.00 to $5,000.00 also given condition, equipment and features.  Both valuations were made after physically inspecting and driving the vehicles.

As noted previously, the Court may also consider Debtors' schedules as evidence under Fed. R. Evid. 801(d)(2).  *See* note 4 *supra*.  Debtors valued the Expedition at $1,000.00 and the F-250 at $6,520.00.  *See* Doc. No. 1 at Schedule B.

Based on the entirety of the evidence and the record, the Court finds the value of the 1999 Ford Expedition to be $2,000.00, and the value of the 1999 Ford

MEMORANDUM OF DECISION - 9

F-250 to be $6,000.00.[13]  Because $776.71 of the $2,000 value, and $3,003.14 of

the $6,000.00 value are required to deal with the direct secured claims of OCCU,

the amount of "equity" available to potentially secure a deficiency on the RV is

$4,220.15.[14]

> ### B.     Cross-collateralization and the treatment of deficiency upon liquidation of the RV

The issue of the effectiveness of cross-collateralization provisions in

OCCU's documents can be reached only after addressing some preliminary factual

matters regarding the transactions between the parties.

The testimony of Robert Hobart establishes that he and his wife have had a

long-standing relationship with OCCU, spanning in excess of 25 years.  Debtors

purchased a number of items with funds acquired from OCCU.  Mr. Hobart

testified that when Debtors completed payments on a "loan" on a given vehicle

debt, they would receive a "clean title" from OCCU, evidently meaning one with

the recorded lien on the certificate of title removed.

Generally, Debtors would contact OCCU by phone when desiring

financing, and the necessary "paperwork" would be faxed by OCCU to Debtors,

---

[13]   The values found by the Court are reached after considering all the details of the testimony, credibility of the witnesses, and determining what weight to give the testimony.  They are also found with due regard for the provisions of § 506(a)(2) which address the manner of valuation of personal property securing an allowed claim in an individual chapter 7 or 13 case.

[14]   $2,000.00 - $776.71 = $1,223.29;  $6,000.00 - $3,003.14 = $2,996.86;  $1,223.29 + $2,996.86 = $4,220.15.

MEMORANDUM OF DECISION - 10

who would sign and return the same.[15]  Mr. Hobart said OCCU never discussed the loan documents with Debtors, including any of the provisions related to liens and security.

The three loans at issue were made in January 2005 (the Expedition), December 2007 (the F-250), and October 2008 (the RV).  Mr. Hobart testified that, in connection with the 2005 loan, $11,000 was advanced which Debtors used to purchase the Expedition from a Coeur d'Alene, Idaho car dealer.  He admits receiving a "Loan Transaction Advance Voucher" (the "Voucher") which he and his wife signed and returned *via* facsimile.  *See* Ex. 202 at 3.[16]  The Voucher states, under the caption "SECURITY AGREEMENT":

> THIS LOAN IS SECURED BY THE FOLLOWING ITEMS IN ACCORDANCE WITH THE SECURITY AGREEMENT AND POWER OF ATTORNEY DISCLOSED IN THE LOAN AGREEMENT AND DISCLOSURES INCLUDED WITH THIS DOCUMENT:
>
> 1999 FORD EXPEDITION [VIN] 1FMRU1866XLA15312

The Voucher further sets forth, lower on the same page and under the heading of "COMMENTS":

---

[15]  Debtors' petition and statement of financial affairs indicate they have lived in Idaho since at least 2004.  *See* Doc. No. 1 at 10 & 41.  OCCU, from its proofs of claim and loan documents, is located in Eugene, Oregon.

[16]  Mr. Hobart testified at some length regarding Debtors' copies of documents related to the Expedition transaction.  *See* Ex. No. 112.  However, Exhibit No. 112 was never offered by Debtors, and never admitted into evidence.  *See* Doc. No. 58 (minute entry).  Despite this error, the testimony, and OCCU's admitted exhibits, allow the Court to address Debtors' contentions.

MEMORANDUM OF DECISION - 11

> This Loan Transaction/Advance Voucher is part of and integrated with your (1) Consumer Loan Agreement and Disclosures, or (2) Home Equity Account Agreement and Disclosure (both hereinafter "Agreement") whichever applies based on the loan purpose indicated on this Loan Transaction Advance Voucher. By receipt of this Loan Transaction Advance Voucher, you acknowledge that the loan transaction described is subject to the Agreement and the Loan Application previously signed by you. Your acceptance of this loan advance is acknowledgment of the Credit Union's security interest in the property described on this Loan Transaction Advance Voucher under the terms of the Security Agreement contained herein and in the Agreement. You acknowledge receipt of a copy of the Agreement if this is the initial Loan Transaction Advance Voucher under this credit plan. Subsequent Loan Transaction Advance Vouchers may not receive a copy of the Agreement unless requested.

Ex. No. 202 at 3. This provision and the language "SEE THE CONSUMER LOAN AGREEMENT AND DISCLOSURES INCLUDED WITH THIS DOCUMENT" appear immediately above Debtors' signatures. *Id.*

Immediately after the Voucher, in OCCU's proof of claim, is a 4-page "Consumer Loan Agreement and Disclosures." Ex. No. 202 at 4-7 (the "Agreement").[17] The Agreement commences with the following paragraph:

> CONSUMER LOAN ACCOUNT. You agree to the following security terms: You grant the Credit Union a security interest in all collateral described (except real property or a dwelling) on this Loan Advance Voucher and any previous or subsequent Loan Transaction Advance Voucher under the security terms set forth below. All collateral

---

[17] In discussing the unadmitted Exhibit No. 112, Mr. Hobart admitted receiving, at the time of the Voucher related to the Expedition, three pages of the Agreement. He denied receiving the fourth page. The first three pages as attached to Exhibit 112 appear identical to the first three pages of the Agreement as attached to Exhibit No. 202. OCCU brought no witness to hearing and, thus, did not discuss what was sent or delivered to Debtors, or anything else regarding the documents involved in the three transactions.

MEMORANDUM OF DECISION - 12

> securing one loan will secure all of your other obligations (except those
> secured by real property or a dwelling) to the Credit Union, including
> all existing and future loans and credit card debt.

*Id.* at 4.  Among the terms included later in the Agreement is the following:

> **Security.**  You grant the Credit Union a security interest under the
> Uniform Commercial Code of the state in which the Credit Union is
> located in all collateral described in any Loan Transaction Advance
> Voucher, which accompanies this Agreement and any previous or
> subsequent Loan Transaction Advance Vouchers.  This includes
> property purchased later and additions (for example, tires or batteries
> attached to a car), whether added now or later.  All collateral securing
> one loan will secure all your other obligations (except those secured by
> real property or a dwelling) to the Credit Union, including all existing
> and future loan obligations, including credit card obligations.

*Id.* ¶ 4.a.[18]

Mr. Hobart testified that he did not read or have explained to him the

information in the "Comments" section on the face of the Voucher above the place

for Debtors' signatures, nor the information in the three pages of the Agreement

they received.  But he acknowledged that Debtors did in fact sign the Voucher,

and received the money that they then used to acquire the Expedition.

The $5,000 of funds advanced in 2007 related to the F-250 used an

identical form of Voucher but with that truck and its VIN inserted in the form

where the Expedition appeared in the 2005 Voucher.  Ex. Nos. 113 & 203.  The

advance of $26,509.00 in 2008, of which $22,794.74 was used to acquire the RV,

---

[18]  This language appears on the first page of the four-page Agreement, and thus is within
the portion that Mr. Hobart admits Debtors received in 2005.

MEMORANDUM OF DECISION - 13

was documented by a similar form of Voucher.  Ex. Nos. 114 & 201.[19]

### 1.    Oregon law applies

The three vehicles are property of the bankruptcy estate under § 541(a)(1).

The nature and extent of Debtors' and OCCU's interests in the vehicles is

determined by applicable nonbankruptcy law.  *Gaughan v. The Edward Dittlof*

*Revocable Trust (In re Costas)*, 555 F.3d 790, 793 (9th Cir. 2009) (citing *Butner v.*

*United States*, 440 U.S. 48, 54 (1979), and *Barnhill v. Johnson*, 503 U.S. 393, 398

(1992)).

In this case, and in order to urge certain case law discussed *infra*, Debtors

argue that Oregon law applies to determine the nature and extent of their and

OCCU's interests in the vehicles.  When pressed at hearing to identify the source

of this contention, Debtors' counsel pointed to a provision in the Agreement that

states, in pertinent part:

> APPLICABLE LAW.  You agree this Agreement will be governed by
> and interpreted in accordance with the laws of the State of Oregon.

Ex. No. 201 (OCCU Claim No. 4) at 7 ¶ 8.[20]  Inasmuch as OCCU offered the

---

[19]  Debtors' Exhibit No. 113 also indicates that Debtors signed documents related to
collateral insurance coverage in favor of OCCU.

[20]  This provision appears on the fourth page of the Agreement which was, of course, the
page of the Agreement that Mr. Hobart testified Debtors never received, a fact that was
emphasized in Debtors' presentation.  The irony of then arguing that this provision on the
*un*delivered page of the Agreement was the source of applicable law appeared lost on Debtors.
Ultimately, it is an irony of little moment as similar language also appears on the third page of the
Agreement.  *See* Ex. No. 201 at 6 ¶ 14.

MEMORANDUM OF DECISION - 14

Agreement as a source of its rights and interests, both in filing claims and in

evidence at hearing, and Debtors urge application of Oregon law under the terms

of that Agreement, the Court finds that Oregon law applies.

> **2.      Oregon law on future advance, after-acquired property, and cross-collateralization clauses**

Debtors argue that the Bankruptcy Court for the District of Oregon

addressed in *In re Wollin*, 249 B.R. 555 (Bankr. D. Or. 2000), the ability of a

credit union to secure an advance to a consumer debtor with collateral from a

separate prior (antecedent) or subsequent secured advance.  Though not identical

to the language of the OCCU Voucher and Agreement, the provision at issue in

*Wollin* had the same effect.  The security interest in the collateral pledged to

secure the subject advance also secured "any other advances [the debtors] have

now or receive in the future."  *Id.* at 557-58.[21]  The court divided consideration of

the issue into two categories: (1) the ability to secure future debt with collateral

provided in a prior lending (the "subsequent loans" or "future advance" issue), and

(2) the ability to secure prior or "antecedent" obligations with collateral given in a

loan transaction (the "antecedent debt" issue).

In regard to subsequent loans or future advances, the court held that, under

---

[21]   A separate, similar clause in the agreements there stated: "Property given as security under this Plan or for any other loan will secure all amounts you owe the credit union now and in the future."  *Id.* at 558 n.5.

MEMORANDUM OF DECISION - 15

Oregon law, if the future advance is to be covered by collateral given in connection with a prior loan, the later advance "must be of the same class as the primary obligation . . . and so related to it that the consent of the debtor to its inclusion may be inferred." *Id.* at 558 (citing *Cmty. Bank v. Jones*, 566 P.2d 470, 482 (Or. 1977)).[22]  The court found no Oregon authority on what constituted "the same class" in a consumer loan context. *Id.*  But it refused to adopt a position that a general category (*e.g.*, all consumer loans) necessarily met the "same class" requirement. *Id.* at 558-59.  It also declined to adopt a *per se* test based on the purchase money nature of the loan transactions.  It ultimately concluded that securing a credit card obligation was not of the "same class" as a PMSI for a vehicle. *Id.* at 559.

In connection with the antecedent loan question, the court found no Oregon authority directly on point, and a split in authority outside Oregon. *Id.* at 559-60. The court held:

> As with future advances, this Court rejects the "plain meaning" test as to antecedent debt.  The Oregon Supreme Court has adopted a standard stricter than "plain meaning" for future advances.  This Court cannot conclude that it would lessen that standard for antecedent debt, especially in the consumer context.  Instead, guided by the policy that dragnet clauses are generally disfavored and strictly construed, this Court adopts the "specific reference" standard as divining the parties' true intent and comporting with sound public policy.

---

[22]  This concept has been called the "relatedness rule" and is a limitation on the reach of future advance clauses in security agreements in recognition of the disfavored status of "dragnet" clauses.  *See*, *e.g.*, *In re Gibson*, 249 B.R. 645, 655-56 (Bankr. E.D. Pa. 2000).

MEMORANDUM OF DECISION - 16

*Id.* at 560.[23]

   Though Debtors raised *Wollin* in a prehearing brief, *see* Doc. No. 57, and

argued it at hearing, OCCU did not address in its written or oral argument that

decision nor any other law of Oregon on the subject of cross-collateralization.[24]

   While *Wollin* raises difficult issues, the Court is not persuaded that it is

controlling authority.  That decision was issued in the summer of 2000.  The next

year, Oregon adopted the revised Uniform Commercial Code.  *See* Act effective

July 1, 2001, ch. 445, 2001 Or. Laws 1383.  As of the legislation's effective date,

Oregon's version of U.C.C. § 9-204 on after-acquired property and future

advances reads:

> (1)   Except as otherwise provided in subsection (2) of this section, a
> security agreement may create or provide for a security interest in after-
> acquired collateral.
> (2)   A security interest does not attach under a term constituting an
> after-acquired property clause to:
>    (a)   Consumer goods, other than an accession when given as
> additional security, unless the debtor acquires rights in them within 10
> days after the secured party gives value; or
>    (b)   A commercial tort claim.
> (3)   A security agreement may provide that collateral secured, or that
> accounts, chattel paper, payment intangibles or promissory notes are
> sold in connection with, future advances or other value, whether or not

---

[23]   The court supported its decision by considering the rationale, expressed in other
decisions, that since the antecedent debt is already owed by the borrower to the lender, the parties
would have no good reason not to make a "specific reference" to it in the subsequent security
instrument if they had truly intended that security instrument to cover it.  *Id.*

[24]   OCCU's prehearing brief asserted the validity of the provisions but without discussion
of Oregon statutory or case law.  *See* Doc. No. 55.

MEMORANDUM OF DECISION - 17

the advances or value are given pursuant to commitment.

ORS § 79.0204 (2001).  The Official Comments to this section further address the

issue:

> 2.  **After-Acquired Property; Continuing General Lien.**  Subsection
> (a) makes clear that a security interest arising by virtue of an after-
> acquired property clause is no less valid than a security interest in
> collateral in which the debtor has rights at the time value is given.  A
> security interest in after-acquired property is not merely an "equitable"
> interest; no further action by the secured party – such as a supplemental
> agreement covering the new collateral – is required.  This section
> adopts the principle of a "continuing general lien" or "floating lien," It
> validates a security interest in the debtor's existing and (upon
> acquisition) future assets, even though the debtor has liberty to dispose
> of collateral without being required to account for proceeds or
> substitute new collateral.  See Section 9-205.  *Subsection (a), together
> with subsection (c), also validates "cross-collateral" clauses under
> which collateral acquired at any time secures all advances whenever
> made.*
>
> . . .
>
> 5.  **Future Advances; Obligations Secured.**  *Under subsection (c)
> collateral may secure future as well as past or present advances if the
> security agreement so provides.*  This is in line with the policy of this
> Article toward security interests in after-acquired property under
> subsection (a).  Indeed, the parties are free to agree that a security
> interest secures any obligation whatsoever.    Determining the
> obligations secured by collateral is solely a matter of construing the
> parties' agreement under applicable law.  *This Article rejects the
> holdings of cases decided under former Article 9 that applied other
> tests, such as whether a future advance or other subsequently incurred
> obligation was of the same or a similar type or class as earlier
> advances and obligations secured by the collateral.*

*Id.* at Official Comment 2, 5 (emphasis supplied).

The adoption of revised ORS § 79.0204 in 2001 casts doubt on the

MEMORANDUM OF DECISION - 18

continued vitality of *Wollin*'s limitations on future advances and cross-collateralization clauses.  This Court's research has not uncovered decisional law from the Oregon appellate courts conclusively addressing the issue.[25]  However, the Court of Appeals of Oregon in 2010, in considering construction of an Oregon statute, specifically noted legislative intent is ordinarily drawn first from the text of the specific statute read in the context of the statutory scheme of which it is a part.  In this decision, that court addressed an argument that U.C.C. provisions should be used to construe the non-U.C.C. statute at issue.  In rejecting the idea that the U.C.C. should be so applied, the court looked not just to the language of Oregon's U.C.C. but to the U.C.C. Official Comments as well, noting: "legislative intent can be derived from the language of the statute along with the official comments."  *State v. Maybee*, 232 P.3d 970, 976 (Or. App. 2010) (concluding from the Official Comments to ORS 72.4010 (U.C.C. § 2-401) that the U.C.C. provisions were not intended to affect the non-U.C.C. public regulatory statute at issue); *accord U.S. Nat'l Bank v. Boge*, 814 P.2d 1082, 1090 (Or. 1991) (quoting *Sec. Bank v. Chiapuzio*, 747 P.2d 335, 339-40 & n.6 (Or. 1987)).

The Oregon Bankruptcy Court has likewise acknowledged the impact of the Official Comments:

---

[25]  The Court is aware that the Oregon Bankruptcy Court in *In re Matrix Dev. Corp.*, 2008 WL 4549117, at *5 (Bankr. D. Or. Oct. 9, 2008), followed *Wollin*.  However, it did not address the change in the underlying statutory provisions.

MEMORANDUM OF DECISION - 19

> Although the Official Comments lack the force of law, they are instructive, because the [Oregon] legislature took note of them at the time of adoption, because they are consistent with the structure of the UCC . . . and because the purpose of the Official Comments is to promote uniform construction of the UCC.

*In re Riach*, 2008 WL 474384, at *3 n.10 (Bankr. D. Or. Feb. 19, 2008) (quoting *Boge*, 814 P.2d at 1090); *see also Hunter v. Woodburn Fertilizer, Inc.*, 144 P.3d 970, 975 n.3 (Or. App. 2006) (same).

Though the issue is not entirely free from doubt, this Court concludes that, were the question to be squarely presented to the Oregon Supreme Court, such court would follow the direction of the Official Comments, and not impose the "relatedness test" of *Wollin* as the same would be inconsistent with the manifested intent of revised U.C.C. § 9-204 and the Official Comments thereto.[26] Cross-collateralization provisions of an agreement would be valid and enforceable so long as the underlying agreement of the parties was clear in expressing such an intent. *See* ORS § 79.0201(1) (security agreement effective between the parties according to its terms).

The question thus turns next to the 2005 loan documents executed in connection with the Expedition purchase financing and the 2007 loan documents

---

[26] This federal bankruptcy court, like its counterpart in Oregon, when considering an issue of state law on which there is no controlling precedent from that state's highest appellate court, is charged with determining how that state court would rule if presented with the precise issue. *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001); *In re Sterling Mining Co.*, 415 B.R. 762, 767-68 (Bankr. D. Idaho 2009); *Sticka v. Mellon Bank (DE) N.A. (In re Martin)*, 167 B.R. 609, 615 (Bankr. D. Or. 1994).

MEMORANDUM OF DECISION - 20

executed in connection with the F-250 purchase financing.  First, there is the

contention of Debtors that not all portions of the Agreement incorporated into the

Voucher for the 2005 Expedition transaction were received via facsimile (*i.e.*, the

missing fourth page issue).  Mr. Hobart also testified that limited documents were

received in 2007.  *See also* Ex. No. 113.

However, Mr. Hobart does admit receipt of the 2005 Voucher.  That

Voucher specifically provides that the loan being made is subject to prior executed

Loan Applications, that it is part of and integrated with the Agreement, and that

"[b]y receipt of this Loan Transaction Advance Voucher, [Debtors] acknowledge

that the loan transaction described is subject to the Agreement[.]"  The three-page

portion of the Agreement that Debtors admit receiving expressly and

unambiguously provides that all collateral securing one loan of Debtors with

OCCU will secure all other obligations of Debtors to OCCU.[27]  The Court further

finds that Debtors executed this Voucher.[28]  In fact, Debtors have never contested

---

[27]   The Voucher also states, immediately above Debtors' signatures and in the
"Comments" section, that Debtors "acknowledge receipt of a copy of the Agreement if this is the
initial Loan Transaction Advance Voucher under this credit plan.  Subsequent Loan Transaction
Advance Vouchers may not receive a copy of the Agreement unless requested."  This informs the
question of whether Debtors needed to receive a complete copy of the Agreement in 2005, or
again in 2007.  However, because of what Debtors admit they received in 2005, the Court need
not rest its resolution of the matter on this clause.

[28]   Debtors' unadmitted Exhibit No. 112 bore no signatures on the Voucher.  But Debtors
from the inception of the case have acknowledged that OCCU is secured in the Expedition.
OCCU's exhibit, Exhibit No. 202, contains a copy of the Voucher bearing signatures of Debtors,
in addition to the Agreement (all four pages, not just the three in Exhibit No. 112), and a copy of
the certificate of title for the Expedition showing a recorded lien in favor of the creditor.  Mr.
(continued...)

MEMORANDUM OF DECISION - 21

entering into the three loan transactions, instead arguing only that the collateral for each loan should be limited to the single item expressly set forth in the "security agreement" box in the middle of each Voucher.

Debtors assail the effectiveness of the Voucher and Agreement in two ways. First, as mentioned, they contend that they did not receive a complete Agreement. For the reasons set forth immediately above, and given that Debtors themselves expressly relied on the language of the Agreement for their contention that Oregon law applied, this line of attack is not well taken. Second, they submit that, because they may not have fully read or comprehended the cross-collateralization provisions, the same should not be enforced. Debtors have failed to support this argument with persuasive authority. And the Court finds the testimony of Mr. Hobart to be insufficient to contradict the effect of Debtors executing the Vouchers and entering into the transactions.[29]

---

[28] (...continued)
Hobart validated OCCU's copies, with the exception of the missing "fourth page."

[29] Mr. Hobart's testimony varied from not reading to not understanding the documents. His responses during OCCU's cross-examination as to whether he could read English were coy. From the Court's observation, Mr. Hobart was intelligent and could understand what he was asked to, and did, read aloud during his testimony. He further appeared to appreciate the concepts of secured consumer financing, and to be capable of asking for clarification if desired. Given demeanor, credibility, and weight ascribed the testimony, the Court finds that Debtors' choice not to read documents when entering into several serial financing relationships, if in fact true, is an inadequate defense to enforcement of the terms of the agreements. *See Portland Freight Serv., Inc. v. Canadian Imperial Bank of Commerce*, 776 P.2d 35, 37 (Or. App. 1989) ("[I]n the absence of extraordinary circumstances, such as fraud or contracts of adhesion in a consumer context, failure to read an instrument is not a defense to enforcement.") (quoting *NW Pac. Indem. v. Junction City Water Dist.*, 668 P.2d 1206 (Or. 1983), *modified on other grounds*, 677 P.2d 671 (1984)).

MEMORANDUM OF DECISION - 22

Because under applicable Oregon law the cross-collateralization provisions are effective and enforceable, the deficiency claim of OCCU from the RV transaction is secured by the equity in the Expedition and the F-250. To be confirmable, Debtors' Plan must provide OCCU with treatment of a secured claim of $2,000.00 on the Expedition, and $6,000.00 on the F-250.[30]

OCCU's objection to confirmation on this ground will be sustained.

**C. Claim Objection**

For the same reasons, Debtors' Claim Objection, which was designed primarily to establish that the "deficiency" on the RV was exclusively a general unsecured claim and not secured by the Expedition and/or F-250, will be overruled.

The Claim Objection also appears to contest the valuation of the RV and

---

[30] The Court acknowledges that this conclusion assumes that the deficiency on the RV loan, whatever that amount is eventually determined to be, will be greater than the $4,220.15 in "equity" in the two Ford vehicles – that is, the value of the Expedition and F-250 over and above the amounts of the loans that Debtors already propose to pay under the Plan. This assumption may safely be made based on the record before the Court as of the close of the hearing. Debtors' own estimate of $17,696 as the value for the RV – the highest asserted – would still result in a deficiency of $7,969.00. Indeed, for OCCU's deficiency claim on the RV loan to be less than the equity in the vehicles the sale of the RV would have to net more than $20,725.23, only $2,000 less than the $22,794.74 Debtors paid to purchase the vehicle in 2008. In addition, OCCU submitted a post-hearing declaration of Rodney Oberg, an employee of OCCU, stating that the RV was sold on May 11, 2011, resulting in net proceeds of $16,750.00. Doc. No. 59. Though ordinarily the Court would refrain from considering such post-hearing evidence, it notes that submission here simply as further affirmation of its assumption regarding the RV's value.

Because the deficiency on the RV loan, by all accounts, exceeds $4,220.15 and the cross-collateralization provisions are valid and enforceable, the entire value of the Expedition and F-250 are encumbered by OCCU's claims. Thus, the easiest way to explain the situation is to simply note that the claims secured by the Expedition and the F-250 under § 506 are $2,000.00 and $6,000.00, respectively. Those claims must be paid through Debtors' Plan under § 1325(a)(5)(B) or the collateral surrendered under § 1325(a)(5)(C).

MEMORANDUM OF DECISION - 23

the calculation of the total deficiency claim that might exist on that vehicle's
liquidation. Under the circumstances of this case, there is no need to value the RV
at this time. *See* note 30 *supra*. OCCU may file an amended proof of claim
regarding the RV once liquidation of that collateral has been finalized, asserting a
general unsecured claim for the deficiency resulting from the sale of the RV (after
deducting, consistent with this Decision, such amounts as are secured by the
Expedition and the F-250).[31]

### D. Section 1325(a)(4)

The record reveals an additional confirmation issue, one not addressed by
the parties. Debtors' scheduled assets include a 401(k), valued by Debtors at
$223,057.00. Doc. No. 1 at Schedule B. Of this amount, only $182,048.00 was
claimed as exempt. *Id.* at Schedule C (asserting such figure as the "value of
claimed exemption"). The exemption is asserted under Idaho Code § 11-604A(5),
however that citation appears to be in error. Presumptively, the intent was to claim
an exemption under Idaho Code § 11-604A(3) which provides for an exemption of
amounts in "employee benefit plans," a term that is defined in Idaho Code § 11-

---

[31]   In yet another wrinkle, the Claim Objection also takes issue with OCCU's proof of
claim showing a 6.650% interest rate on the Expedition when the Voucher for that financing set
out a $4.950% rate. *See* Doc. No. 51 at 3; *see also* Ex. No. 202 at 1 & 3. That misses the point in
two regards. First, Debtors themselves proposed a 6.650% rate for the Expedition secured claim
in their Plan. Doc. No. 36 at 5. Second, the discount or interest rate to be used for payments on
secured claims under § 1325(a)(5)(B) is not necessarily the contract rate. *Till v. SCS Credit
Corp.*, 541 U.S. 465 (2004). To the extent that this objection takes issue with the way that OCCU
calculated the $776.61 balance due on the claim (*i.e.*, an argument that it accrued interest at a rate
in excess of the contract rate), Debtors did not explain their concern nor provide a record on
which the Court could address the issue.

MEMORANDUM OF DECISION - 24

604A(4) and which this Court has interpreted as including amounts held by debtors

in IRA accounts and 401(k) plans.  *See*, *e.g.*,  *In re Carlson*, 2009 WL 2589161, at

*2-3 (Bankr. D. Idaho Aug. 20, 2009); *Gugino v. Ganier (In re Ganier)*, 403 B.R.

79, 83 (Bankr. D. Idaho 2009).  No objection to the exemption has been raised, and

it is therefore allowed.  *Ganier*, 403 B.R. at 83, n.8 (citing *Taylor v. Freeland &*

*Kronz*, 503 U.S. 638 (1992)).

     However, the exemption that is allowed is limited to the $182,048.00

Debtors claimed, even though Idaho Code § 11-604A(3) contains no monetary

cap.  *See Schwab v. Reilly*, __ U.S. __, 130 S.Ct. 2652, 2660 (2010) (discussing

ability of trustee and creditors to take the claim of exemption "at face value" and

rely on an asserted amount that is "within statutory limits" without being required

to determine if "the debtor 'intended' to exempt a dollar value different than the

one she wrote on [Schedule C]."); *Gebhart v. Gaughan (In re Gebhart)*, 621 F.3d

1206, 1210 (9th Cir. 2010) (stating that *Schwab* established that "even when a

debtor claims an exemption in an amount that is equal to the full value of the

property as stated in the petition and the trustee fails to object, the asset itself

remains in the estate, *at least if its value at the time of filing is in fact higher than*

*the [asserted] exemption amount*.") (emphasis added).

     The manner in which Debtors' exemption is asserted suggests that

$41,009.00 of value in the 401(k) is not claimed exempt, and thus remains part of

the bankruptcy estate.  That value must therefore be considered in evaluating

MEMORANDUM OF DECISION - 25

whether the plan comports with the requirement of § 1325(a)(4) that unsecured

creditors in the chapter 13 receive as much as they would should Debtors liquidate

under chapter 7.  Despite this discrepancy, the chapter 13 Trustee recommended

that, subject only to resolution of the objection of OCCU, the Plan should be

confirmed.  Doc. No. 39.  In doing so, Trustee opined that unsecured creditors in a

chapter 7 would receive $2,487.00 but stood to receive $10,435.50 under the Plan,

*id.* at 1, thus satisfying the requirements of § 1325(a)(4).  Notwithstanding the

Trustee's recommendations, Debtors have the burden of persuading the Court that

they and their Plan satisfy all of the § 1325(a) requirements.  *See, e.g., Barnes v.*

*Barnes (In re Barnes)*, 32 F.3d 405, 407 (9th Cir. 1994) (citations omitted); *see*

*also United Student Aid Funds, Inc. v. Espinosa*, ___ U.S. ___, 130 S.Ct. 1367,

1379-81 (2010).  Because the $41,009.00 of 401(k) funds not claimed as exempt

would be distributed to unsecured creditors under chapter 7, Debtors' Plan does

not comply with § 1325(a)(4) and may not be confirmed on the extant record.

**CONCLUSION**

The Court finds the value of the 1999 Ford Expedition is $2,000.00 and the

value of the 1999 Ford F-250 is $6,000.00.  *See* § 506(a).  The Court will sustain

OCCU's Objection and deny confirmation of the Plan.  The treatment of the

secured claims of OCCU in regard to the Expedition and the F-250 do not pass

muster under § 1325(a)(5)(B) in that they do not provide for payment of the full

allowed secured claims in light of the cross-collateralization provisions of the

MEMORANDUM OF DECISION - 26

underlying agreements and the values as established for the two Ford vehicles.

Confirmation will also be denied because, on the present record, § 1325(a)(4) is

not satisfied.  Such denial is without prejudice to the filing of an amended chapter

13 plan.  Finally, the Claim Objection will be overruled.

   The Court will enter an Order in accord with this Decision.

DATED: May 20, 2011

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 27